Case No. 25-1039, Music Choice Petitioner v. Copyrighted Royalty Boards and Librarian of Congress. Mr. Fackler for the petitioner, Ms. Mundell for the respondents, Mr. Helmuth and Ms. Berry. Good morning, Your Honors. May it please the Court, Paul Fackler for Petitioner of Music Choice, and I'd like to reserve two minutes of my time for rebuttal, please. Your Honors, this appeal relates to the royalty calculation rule applicable to a statutory license in the Copyright Act that is available to Business Establishment Services, or BES. The BES are essentially digital radio services that transmit music programming to retail and other commercial establishments, so those businesses can play music in the background while people shop there or otherwise visit the business. In the rate-making, reopened rate-making proceedings below, the Copyright Royalty Board interpreted the gross proceeds definition in that rule in a manner that's completely inconsistent with the plain meaning of the actual text of that regulation, and it's for that reason that Music Choice asks this Court to vacate the ruling. Now, I understand that Your Honors have some threshold questions about how we got there and how we got here, and I'm happy to address those briefly to start, given that it's on Your Honors' minds. Way back in 2019, Sound Exchange sued Music Choice, claiming underpayment of its BES royalties. Those claims were based on a dispute between meaning the gross proceeds definition in this regulation. After filing that lawsuit in the District Court, Sound Exchange asked the Court to invoke primary jurisdiction and refer, as that term is used in primary jurisdiction, the threshold interpretive issue to the Copyright Royalty Board. Music Choice opposed, citing both the plain language of the regulation and also the prejudice to Music Choice and the likely delay in that sort of referral. There had only been one prior instance of a similar referral, and it took many years to get a ruling. 18 months later, the District Court finally issued its ruling, invoking primary jurisdiction and issuing the referral and staying the case. At that point, Sound Exchange filed motions in front of the Copyright Royalty Board in three separate old BES proceedings that had already been closed to reopen those proceedings and handle this referral. Copyright Royalty Board agreed to reopen two of those three proceedings, and then about three years later issued its decision interpreting the rulings. At every step along that long process, each party invoking primary jurisdiction specifically cited the Copyright Act Rule 803c4, Continuing Jurisdiction of the Copyright Royalty Judges, as the sole grounds for jurisdiction for the CRB to answer these interpretive questions. So Sound Exchange repeatedly cited that rule in the first part of C4 and only that rule. The District Court cited the cases requiring the District Court to find that the agency would have jurisdiction to open proceedings to answer the referral and relied on C4. And, of course, the Copyright Royalty Board itself, when it issued its final ruling, cited its continuing jurisdiction under C4. Now, for some reason... Where did it do that? It did that... That would simplify things, but I haven't seen an explicit reference to C4 in this decision. Okay. In the CRB, in Joint Appendix 114 and 115, Note 6, you're right, Judge Garcia, that they didn't say specifically 803c4. What they did was they cited their continuing jurisdiction and they cited to the Register of Copyrights ruling on the scope of continuing jurisdiction. And if you read the Register's ruling, and this was from that prior SiriusXM proceeding, what the Register ruled was that the first part of C4 was the ground for jurisdiction, for answering these sorts of interpretive referrals. So it's not really clear why the judges, when they finally got... In all other instances with the District Court and Sound Exchange, they cited the exact... Sorry, can you explain... This language just seems pointedly only saying we have jurisdiction because we did it once before. Well, in 115, Note 6, I think that they are the only place that they invoke any jurisdiction. And again, in the context where both the District Court and Sound Exchange specifically argued that jurisdiction to them, this is their only reference to why they have jurisdiction to issue the ruling. And in Note 6, they cite as the basis of their continuing jurisdiction, they reference the Register's ruling. And they're adopting that same ground. I don't... Respectfully, I don't think that there's any other way to read what they're saying in that footnote other than this is where we're getting our jurisdiction, which they have to do. And that was the only ground that the Register gave in that ruling as to why the Copyright Royalty Board has continuing jurisdiction to consider ambiguous terms in their regulations. Am I right that the two proceedings that were reopened were settlements? Yes and no, Your Honor. They were proceedings that were opened. There was a controversy declared. There was a notice of commencement of proceedings. There was a request for parties who wanted to participate. I understand that I'm asking, were they resolved by settlements? The proceedings were ultimately resolved by settlements. Yes, Your Honor. Right. So there was no... When there's not a settlement, you have to have this formal proceedings where the Board then makes a determination. Well, yes, there was, Your Honor, because the way that it works, there are two different types of proceedings that the Copyright Royalty Board can handle. One is called a distribution proceeding, and the other is a rate-making proceeding. They have different processes. In a distribution proceeding, and the Board cites this independent producers group case as an example from 2014, where this court held that a particular order of the Copyright Royalty Board was not appealable to this court. That was a distribution proceeding. And the way that those work is the royalties are paid into the Copyright Office, not to sound exchange, right? And the claimants, the only dispute is whether the claimants who are entitled to a share of those royalties, they all file claims on a periodic basis with the Copyright Office. And what happens is every year the Copyright Royalty Board looks at those claims, determines whether there's a controversy. In other words, whether there's a dispute between the copyright owners as to how to whack up those royalties. If there's no, if they determine there's no controversy or dispute, there's no commencement of proceeding. A notice goes to the register of copyrights saying, please just distribute the royalties pursuant to these claims. And then there's never a notice of commencement. It's different in the rate-making proceedings, which is what these are. In the rate-making proceedings, there's always, every five years, they issue a notice of commencement of the proceedings. The parties then file their notice of intent to participate. There are preliminary things that go on related to setting the schedule. Then there's a negotiation period, and the case can settle then or any time after. And then it's unsettled. Yes. Then. Yes. But once it is settled, here's another difference between distribution and rate-making proceedings. In a distribution proceeding, the board has no authority to review the settlement terms. It has to just implement them as they're given. In a rate-making proceeding like these, the court has an independent obligation to review the settlement terms for reasonableness, and then implement those terms if found reasonable in a final determination that is then published in the federal register. So in both of these real- Does that have precedential effect, like the parties settle, and then the board approves, and is that precedential? Yes, Your Honor. That has been binding on all licensees, whether they participated in the proceeding or not. Those rates and terms are then in effect for the next five years of that. So if parties agree on a particular interpretation of a regulation, or et cetera, in a settlement, and it goes into effect, then that becomes the actual interpretation of that regulation? I'm not sure I understand fully the question, because typically- I'm asking, like, if in a settlement negotiation, there was a dispute on the definition of gross proceeds, and the parties reached some kind of a settlement, like this is what it means, and then the Copyright Realtor Board approves that settlement, is that the definition or the interpretation that the Copyright Realtor Board adopts then? Yes to the definition. I have to say no to the interpretation, because the way the settlements work, there's no real way to agree on interpretation in these settlements. What the parties agree on are what the regulations will say, the text of the regulations. So if the parties believe that there's an ambiguity or have a disagreement on what the regulations mean, what they would be doing is negotiating, how will we change that, and can we agree on a way to change the terms to resolve that ambiguity? That never happens in this case. Why would you have to do that? Why wouldn't you just agree that, for purposes of this settlement agreement, gross proceeds means X, Y, and Z? Yes, and that is exactly what- That's not changing the regulation. I agree, Ronna. I was merely just trying to respond- That's an interpretation. That's an interpretation. Oh, okay, but all that would be, that would not be in the settlement agreement, and that would not be in- Well, having done several of them, it's just not normally in the settlement- I guess you haven't done it before. I guess you wouldn't be here if you had, but I don't see what principles of settlement agreements that would preclude parties from saying, for purposes of the settlement agreement, we all agree that gross proceeds means X, Y, Z. I think the reason that that wouldn't happen, Your Honor, is because the settlement agreements themselves are not typically made part of the record. What is issued in the federal regulations is, here are the terms, the terms of the rules that the parties have now agreed to, and we're going to put those into the CFR, okay? I don't disagree with you on that. One, I understand why you couldn't do it, and two, whatever, you have a contractual relationship that could be enforced. It would have to be an enforced contract. I agree, Your Honor, if I understand the question that the parties could enter into settlement agreements like that, and as long as that part of the settlement agreement was made part of the public record so other licensees knew that that was part of the settlement, but in my experience, it's a much better approach to just change the regulation so there's no ambiguity, and then you don't have to discuss. What do you mean by change the regulation? The terms of the agreement that's filed in the Federal Register changes the terms of the regulation? Yes, the settlement can. It can either roll over the existing terms and just change the rates, but what you're always working off of in these, after you're past the first rulemaking proceeding where the terms are initially set, from there on, you're starting with the old terms, and you're saying, do we need to make any changes to these? Sometimes, all of you change for the royalty rate, right, the percentage of revenue in the case. Can you make this concrete in the context of this DES term and gross proceeds? What did they decide in the settlement agreement about gross proceeds, and what does that mean? Okay, so in the two proceedings there that the board reopened, I do not believe there was any discussion about that provision and what it meant, or even any disagreement among the parties. Then in reopening, they can't be clarifying an ambiguity if it wasn't addressed in the first determination, can they? Well, yeah, I think that they can if the ambiguity only comes to light later, and I think that's the reason the register found that this continuing jurisdiction was necessary and appropriate under correcting errors, and that you could reopen prior proceedings even after that rate period was closed, because if the ambiguity only becomes clear as further rate periods go on. So in the settlement agreements that were previously reached, what did they decide about the rates to be paid for these DES gross proceeds percentages? In some of the rate periods, the rate has crept up slightly from period to period, the percentage of revenue, but the language about gross proceeds and how it's defined has not changed. But I'm just wondering what number did they come up with, and did that number reflect including or not including the DES? It reflected the gross proceeds definition as it has always been since the first Corp, after the first Corp, and so the only thing that- Which means it didn't include the DES? It was only DES. So these regulations only apply to revenues received by a DES for provision of its ES. Right. I'm just wondering, like the issue before us is whether to include or not include certain- Sole purpose. Right. And I'm just wondering if the number that they came up with included or did not include that. Well, based on the plain language of the regulation, Munich's position is that it always included this limitation on gross proceeds. And was that reflected in the prior things that were reopened, the prior determinations? It was never specifically discussed. It wasn't discussed, but the number must have reflected a calculation, and that calculation reflected Music Choice's position? Yes, because it's in the plain language of the regulation. The royalty is just- Is what you're saying is that there was a prior proceeding, this regulatory text was the same, and that was mainly about the number 10, 11, 12. Now it's 14.5%, right? And that's what you agreed on. And it's just that nobody had thought of this question. What do you do with a sole purpose versus a dual purpose channel? And that's the ambiguity that has arisen in the context of this dispute. So you've reopened that proceeding, and in your telling, we have jurisdiction. Is it as simple as it was a reopening under 803c4? So this is a contested order of the board under 803c, you have jurisdiction. Is that- is it any more complicated than that? I certainly don't think it's more complicated than that, because that is the sole basis for jurisdiction that was cited. 803d, the appellate jurisdiction provision, says any- Step back. C4 only allows the board to issue an amended determination to correct an error, right? So all that they could have done is issue an amended determination. In d, the appellate jurisdiction, it says any determination under 803c is appealable to this court, right? So it clearly, based on the only possible grounds of jurisdiction that the board could have exercised, because it has no other jurisdiction, that is clearly subject to appeal in this court. Well, they might stand up and say they have some other authority, but can I ask you about the merits?  Just as a practical matter, and this is going to simplify somewhat, your basic position is Music Choice offers a channel, and it only goes to BES customers. You pay the royalty on revenue received in connection with that channel. Not exactly, Your Honor. What it has to do with is what technology is used. How does the transmission, the broadcast transmission get- So one more detail would be you use at least one ephemeral copy in transmitting that channel to your BES customers. Right. There are some subscribers to Music Choice's BES for which the exact same transmission that goes to other types of services goes to the BES without any additional copies being made. It's only a performance. But there are some subscribers that Music Choice has to use a different technological system to get those broadcasts to the location that do require at least one additional copy to be made, and Music Choice pays the BES royalty on all of those. So my understanding, the briefs and the record don't say much about the technology, but to my understanding, it was essentially a difference between channel one goes just to BES customers, and it has to, for whatever technical reason, you have to create at least one new ephemeral copy. Channel two, you are also creating ephemeral copies. It's just that it ends up at- it serves two services, your PSS and the BES, and you think you don't pay any royalties for the revenue from BES customers on channel two. Almost.   And, you know, the reason that you don't see a lot of these facts in the briefing is because what was presented to the board was purely a legal issue of, like, how do you interpret these? Then whether the facts line up with that interpretation would be for the district court to sort out, right? But to answer your question, there are channels that go both to BES subscribers and to other types of service subscribers, right? And the ephemeral copies at issue are server copies. They're basically these copies of the recordings that sit on computer servers and that are drawn from to create these broadcasts, right? Those are the copies. So once a channel is created using those copies, they can go to BES subscribers, and they can go to other types of subscribers, right? Same exact channel. But even within the BES subscribers, some of them get it directly in the exact same way so that no additional copies have to be made. Other BES subscribers get it through a different, more of an internet-type system that requires the making of separate server copies that have to create those performances. So basically, it's a subset, even of BES subscribers. There are certainly a number of subscribers of the BES who Music Choices does pay royalties on. Otherwise, they wouldn't be paying any royalties. If they had a way of getting the performances to all of their BES subscribers without making Let's take one of the hypotheticals you just, one of the ways you just described is you need to create new server copies in delivering the music. Yes. Okay. My understanding of what this case is about is if that channel only goes to BES customers, you pay royalties. But if you also send the same channel to some other service, you don't pay royalties on what your BES customers pay, right? No, because even if, you know, only in instances where additional copies are made, does Music Choice pay the BES royalties? Okay. Well, that's what you think the rule should be, right? The sound exchange thinks the rule should be in even if you have a dual-purpose copy, you ought to, let me just simplify this. This is how it appears to a judge who has read this opinion and doesn't know exactly how it works. Yep. You're saying that if you make $1 million from your BES subscribers for a channel, and that's only people you make money from for it, you will pay the royalty rate, 100, in some subset of these situations. But in that exact situation where you otherwise would have paid, I think it's right now $145,000, you will pay zero on that $1 million so long as you also deliver that channel to a PSS customer, to someone other than a BES subscriber. Isn't that what this case is all about? If it's not, I have no clue what this case is about. Yeah, I mean... That's the point of your solely argument. That is solely. It is not going solely to BES. It's going to two services, and so we don't pay any royalties on the BES. But it's not whether the transmission is going to, because remember the key, the odd thing about BES services is there is no public performance rate, okay? So the question of whether services are receiving performances should be irrelevant to the value of this license. It's only... That's not even how it works on your view, counsel. Your view is, as long as you make one, if you have a BES-only channel, you might need to make one ephemeral copy, or you might need to make a million. Right. It doesn't vary. Your royalty payment does not vary based on one copy or a million. It varies based on the payment your customer gives you, because no one cares about how many ephemeral copies you make. They care about what value are you deriving from it. Well, but that is driven by what's in the actual regulation, and I would just point out that sound exchanges and the board's interpretation would have the same effect as long as music choice changed so that all of its revenue came from payments in kind. It would, so... Can I just get an answer to Judge Garcia's question, which was, if you've made a copy, you've made your copy, you've used it for your PSS service, and then you use that same copy to send out to your BES customers, do you pay anything on the proceeds from those BES customers? You do not, according to the terms of the regulation, because those are... This is what I'm trying to build up here. Why does that make any sense, right? I mean, it just says, this might not be the reality, but it would allow the result that you get $1 from a PSS customer and a billion dollars from BES customers, and you'll pay whatever this royalty rate is on your PSS income and $0 on your BES income. And these terms are supposed to reflect, you know, real-world... So I want to know, if that seems to be the rule, why would someone agree to that? Here as well, it's not a question of agreeing to it, it's a question of what is in, you know, what are you looking at the statutory basis and regulatory? I just want to understand the practical matter why it's not a seemingly absurd result. Absolutely, because there are certain types of services that Congress has decided are exempt from public performance royalties. Terrestrial radio is one of them. Business establishment services are another. So Congress... And when the law was changed in 1995 and 1998, and even recently in the Music Modernization Act, Congress still has not changed any of that. So there's already been this idea, and let's be clear, the value of a radio transmission to the consumer is the performance, okay? The rest of it, they don't care, as you said, how many ephemeral copies are made. So Congress has already said, as a starting point, the record companies aren't entitled to a royalty for the performances. And by maintaining that, even when they created this ephemeral copy provision and this license, certainly it would be possible, for example, a BES could decide to stream all of its performances from CDs, not make any copies at all, even if they don't happen to have dual-use copies. And then you wouldn't need a 112e license at all. Correct, correct. But it's clear here that if a BES shouldn't have to decide to be all-in or all-out, there's no rational reason. If the record companies can get a little more money, because for some of their customers, they prefer to use a different technological system where they have to make additional copies, then they pay a royalty. But in our view, what this regulation does is balance this admittedly odd situation, where Congress had said, they're not entitled to royalties for the performance, which everybody knows is where the actual value is. But if you want to make these server copies, you can get this license to do that. So this is a way of balancing, because reading it as if all fees and revenues, even where no additional copies are made, fall within this. That essentially gives the record companies a royalty payment for the performance where no copies were made. Here's another, maybe this is a technical question, but it's actually about the regulatory text. It refers to derive from the use of a lot of words that I think mean ephemeral recordings. So derive from the use of ephemeral recordings. Whenever you describe your argument, you say derive from the making of ephemeral copies, because you want to say that whenever you make a copy for two purposes, it's not included. Is there a difference between the making of the copy and the using of it? Because you could imagine a world in which you're making an ephemeral copy, it's stored on the server, and then you're just calling on it on different times for your different services. And one reasonable view of that would be, you made it at time one, now you're using it. And the second time when you use it, it's for the sole purpose of facilitating a BES song performance. What's your response to that? Yes. Yes. Well, my response to that is, first of all, you have to look at when it's talking about use under 112, it says use under Section 112. Section 112 only relates to the reproduction right, the making of a copy. There is no, in Section 106 of the Copyright Act, it sets out specific individual exclusive rights. There is no copyright owner doesn't get the right to use the copyrighted work in the broadest sense. There are these exclusive rights. And the only right that is granted under Section 112, under the 112 license, is the right to make reproductions. To make copies. So that's why, and because... For a particular use. Yes, for a particular use. Okay. But the way that MusicChoice's technology works in these situations is that the use is the same. It's the same transmission that goes to cable companies. And then it either winds up, after MusicChoice is done with its part of the process, it either goes to a commercial customer or a residential customer. So even with respect to the question of different use, it wouldn't make a difference in its application to MusicChoice's situation. Because it's always using... Even if you were going to say... It's sort of going out. The channel is going out. And however you're making and using ephemeral copies, it's being done the same way for the P. It's simultaneous for both customers. Exactly. There's no distinct copies at any time involved in the process. The only time that there's a difference is at the final performance. And that's why, you know, trying to capture that into the... You're calling performance the use? No, no. The performance, the use is the use by MusicChoice when they're transmitting. It's because the use is... Transmitting, let's just make it simple, down your BES line or down your subscriber line? There's only one line. And then at the cable company point, it then branches out to particular subscribers. Some are business subscribers. You must be in control of that branching process, because that's how you're making your money, is from those people on the receiving end of this music, correct? We do get our royalties from the cable company that are passed on based from the subscribers, yes. Do you tell us... Sorry, is the cable company some freestanding player that does what it wants? Or do you say, here's my list of BES customers, they get this music. Here's my list of subscribers. It's actually the cable company that has the relationship, direct relationship with the business subscribers in those instances. They may have a direct relationship. Do you have any control over it or any input into it? No, I don't believe so. I don't believe... You don't have one customer at the cable company? No, there are many cable companies. And then there are other business establishment subscribers that go through another process through... And those are the ones that we're paying the royalties on and why we have to set up different servers for that purpose. Okay. But again, the use here, the key thing, I think, to respond to your question is the use that's described here is use for the purpose of facilitating a transmission. So the use is not the transmission. It's the use of the copy to facilitate. It's before, you know, what is captured in here, what is supposed to be captured in here, are the uses before the actual, you know, final performance. What are those? What technically is happening? How are you using the ephemeral copy? They're sitting on servers, and they're then being used to generate streams of bits. And once those streams of bits are going through the pipes, the DC circuit has a case, I'm a pizza, that says those sorts of... I'm a pizza, isn't it? I love that. It's a great title. But it's a greater case because it makes very clear that once these digital files are being transmitted for the purpose of these performances, like as they're being transmitted through these pipes, just in bits and bytes, those are not copies under the actionable, under the Copyright Act. You can't sue somebody, in that case, that had to do with jurisdiction. And the only conduct that was happening within the United States were allegedly infringing images, digital images, being transmitted through the internet to get other places. And what the court found is because those files were not assembled and then viewed, there was no public display, because for images, it's not public performance, but public display, because that all took place outside the United States. And only these, what they called ephemeral copies, it was a different use of the term than it's used in the statute, those ephemeral types of ephemeral copies are not even actionable under the Copyright Act. So to say that that would be covered by the license, it couldn't be covered by the license, because you don't need a license for those. So, but you can see that you are using the ephemeral recordings in two streams, to your individual listeners and to your business establishment customers. So it is a use of ephemeral recording, either way. There is a, there is, yeah, there is a use of an ephemeral recording. In some instances, it's being used to facilitate more than one transmission, a transmission to more than one transmission that goes to multiple non-BES customers and BES customers. So it's not for the sole purpose of a BES transmission. Oh, let me ask you this, counsel, because when I look at the language that we're interpreting here, it's for the sole purpose of facilitating a transmission to the public of a performance of a sound recording. That is the definition of an ephemeral recording. Like the definition of ephemeral recording under 17 U.S.C. section 112 is blah, blah, blah. But it's used solely for the transmitting of organizations' own transmissions within a local service area. I think solely in this context seems to me just to be describing what an ephemeral recording is. It's used solely to facilitate transmission. Like you had to make this copy to facilitate transmission. And if that's what for the sole purpose means, they're just talking about ephemeral recordings, it seems to me that the best reading of this is that you have to pay any time you're using an ephemeral recording. And it's not about whether it has a dual use or whatever use. You just have to pay whenever you're using it. Well, respectfully, Your Honor, that leaves out the rest of that clause, okay? It doesn't just say for the sole purpose of facilitating a transmission. It says a transmission under the limitation on exclusive rights specified in 17 U.S.C. 114-D1-C4. Which if that was the BES, the provision that says you have to pay. Yes. But only for a sole... No, no, that's... Ephemeral recording. I'm sorry. The 114 that they're citing here is the exemption that BESs have for the public performance right. Right. But you have to pay the license for the ephemeral recording. That's what this is saying. Well, it's saying only if it was used solely for the purposes of a BES transmission. I think sole purpose goes to just this is an ephemeral recording. It's the definition of an ephemeral recording. So if you use for the use of an ephemeral recording, you pay. And this rest of it just says you would be exempt from performance licensing fees, but you still have to pay the ephemeral recording licensing fee. And so you should have to pay any time you use the ephemeral recording. Well, respectfully, Your Honor, I just don't think that's what it says. The 114 is not the ephemeral recording. That's saying it's the BES service. It's under the limitation on exclusive rights specified in there. So you wouldn't have to pay for the performance recording, but you would have to pay for the ephemeral recording. But this regulation has nothing to do with whether or not Music Trust has to pay for the performance. It's... And by the way, I would point out that neither the board... You don't have to pay for the performance recording. You have to pay for the ephemeral recording any time you use it. So it's not about whether it has a dual use or a single use. If you use it, you pay. Your Honor, I would say that, first of all, neither the board nor Senate has even argued that it was that broad. No, I understand that. But I mean, if we get to the merits, it sounds like we have to look at this afresh in some sense. And it just seems to me that the most logical reading of this regulation is that this whole disputed language, it's not that it's modifying in kind. It's that this is describing ephemeral recordings. It is exactly the definition of an ephemeral recording under the statute. And so all this is saying is you pay when you use an ephemeral recording. That's the way I read it. Your Honor, respectfully, that's not true. This is not the definition of ephemeral recording. There are all types of ephemeral recordings other than... I'm looking at 17 U.S.C. Section 112, and it uses the word solely. But it's only trying to describe that you're making these ephemeral recordings for the use of transmission. You use it to facilitate transmission. That's what solely means in this context. It's not about the difference between dual uses of an ephemeral recording. It's just what an ephemeral recording is. But that is the purpose of saying solely for the transmission under the limits of a BES transmission, which is what 114 D1C4 means. It is not saying you have to pay for the... You don't have to pay for the performance. That would have no logical relationship to how you calculate the royalty for just for the ephemeral copies. It's ephemeral recordings subject to the limitation on exclusive rights specified in 17 114 D1C4, which just says you don't pay for the performance. So you still have to pay for the ephemeral recordings. But then what work is for the sole purpose doing in the regulation? That's the definition of what an ephemeral recording is. It's made for the sole purpose of facilitating transmissions. And the word sole is in the definition of ephemeral recordings. But that would already be captured in the citation to 112E then, if that were... Derived from the use of copyrighted sound recordings during the license period pursuant to 112E for the sole purpose, which is ephemeral recordings. I mean, it's not obviously a great drafting job. But it just seems to me that the most logical reading of this is sole purpose. It's just the definition of ephemeral recordings. Because sole purpose is in the definition of ephemeral recordings. And it's not about splitting up whether it has a dual purpose or sole purpose. It's just ephemeral recordings. Well, as I said, that would have the effect... Reading it that way would have the effect of capturing all the value of all the performances, even where no additional... The very usage that's allowed by the license isn't being taken advantage of. When you make an ephemeral recording, it looks like you make it and it's good for six months, right? In practice, those time periods are waived by the regulations and the agreements of the parties in the industry. People are not refreshing their server copies every six months. But you use that ephemeral recording, I guess, once during the six months for each of these two students? Or how often do you use this ephemeral recording? They essentially sit there indefinitely. I mean, there may be times... But you're using the same one over and over. You're transmitting the same one over and over. So you would only... So right now, you would theoretically be paying it once for a dual-purpose thing. And if you just read ephemeral recordings in this provisioned way, you would just be paying it twice because you would use it once in this stream and once in that stream. And that's the way it would work? It would all depend on whether for a particular subscriber, a specific... Copies were made solely for that BES subscriber. Solely for... But take away your reading. Under my reading, which is that for the sole purpose of facilitating, it just means ephemeral recording. So basically, you pay if you use an ephemeral recording. You use... It's the same recording. How many times do you use it? If you just use it twice when you're using it for both streams? It's used. No new copies are made, but it's used every time a channel is transmitted. It's a broadcast model. So there's one transmission that goes to tons of subscribers. And what do you pay? Do you pay every time it's used? Or only... How do you pay for this? We pay based on all of the revenue from subscribers going on in perpetuity that are relying on these server copies that are only made for BES. So gross proceeds based on the ephemeral recording. Correct. No, the... No matter how many times you use it, it's just what you're getting for it. Right. Because you're paying based on the revenue. So... So under my reading of the statute, then, if I think that this just means sole purpose equals using the ephemeral recordings, you would just pay gross proceeds based on your BES stream as well as your, I guess, private listener stream, whatever you want to call that. It would be just the totality. Under that reading, it would capture irrespective of how the ephemeral copies were used or all gross revenue. It would essentially render all of this kind of beside the point because... It would capture it so long as you were using an ephemeral copy to transmit songs to BES customers. Right. But if you are not using... I'm sorry. Go ahead. If you're not using any ephemeral copies, so if you went back to the system where you're You wouldn't need the license. You wouldn't be paying any royalties anyway, right? Why aren't they doing? I don't know. I know that earlier in the history of Music Choice, I think there was a time when they were... Their quality is probably not as good. Oh, I don't think that's the case. But yeah, compression, digital compression is not great over the internet necessarily. Why are you doing worse music then? Honestly, Your Honor, as far as the facts related to this, I... Music Choice makes... I'm sure that there are benefits to doing it the way that they do it, right? This cost benefit analysis. So Judge Pan was asking why it's unreasonable if... I think we all agree that if you have a BES channel that doesn't use ephemeral copies at all, that you don't pay royalties. And what Judge Pan, I think, was suggesting was all that would happen under her reading is that you pay the royalty based on the total BES revenue for a channel that you do use an ephemeral copy in, one or more, right? Why is that unreasonable? I believe it's unreasonable because if that was what the regulation was trying to accomplish, it would have ended just with gross proceeds are all... Like all of this other... So for example, you know, received from any source during or after the license period, you wouldn't need any of these qualifiers on the revenue. You would just say all fees and payments, including those made in kind, derived from the use of any ephemeral recording. That is what it says because before that, they don't define ephemeral recording. But then it goes on and it says used for the sole purpose of a BES transmit, of facilitating a transmission to a BES. Right. That's the definition of ephemeral recording. Don't you want two soles in here? You want the word sole, as Judge Pan's saying, that's just describing the sole, the purpose of facilitating a transmission. But you want another sole further down that says transmission to the public of performance of a sound recording solely under limitation. We would say solely to a BES customer. You want another... You want actually a sole lead. You want an adverb. I don't believe so, Your Honor. I don't think you have to repeat. I'm sorry. It's just going a long way down the sentence. You want that sole up there to do two things, be an adjective and an adverb. But there's no intervening switch. There's nothing linguistically like there is with the including those made in kind reference, which does operate as an independent thought. There's nothing in the rest of that sentence that would require another sole lead. It does. Because you wanted to describe both the purpose of facilitating a transmission, definition, and that transmission has to be solely for BES customers. Is that right? No, I don't think you need another sole lead because that's one long... Admittedly, it's an awfully long sentence, but that's not unusual in an agency regulation. There's nothing that switches... Solely. It has to go solely to a BES customer. The transmission, we only pay if it goes solely to BES. Solely to facilitating a transmission to the public of a sound recording under the BES statute. That's all one clause. I'm just saying you want the sole to operate on where this ends up. On the entire rest of that sentence, yes. You want it to go where this ends up, for BES. It limits the entire remainder of the sentence. Okay. Okay. All right. But the sole purpose of facilitating a transmission, that just means it's an ephemeral recording. So the use of this definition of ephemeral recording under the limitation of BES means if you use the ephemeral recording for a BES transmission, you pay. In the way authorized by law, yes. I'm not sure. You know, it's solely for the purpose of a BES or a transmission to a BES. That's what... That's what Judge Millett is saying. You want to add an additional meaning of solely because I read solely just to be...  ...the use of it is for an ephemeral recording. It's used to facilitate the transmission. That's the sole purpose of it. But you're trying to say, and it has to go solely to a BES. I believe that's what the sentence says because it's one continuous sentence. But not... If sole means my meaning of it. Sole modifies purpose here. That's just grammatical. Sole modifies purpose. Sure. But the purpose... In describing what the purpose is... Sorry. Just trying to get it out. There's two things that that could be. The sole purpose could be to facilitate a transmission to the public of a performance definition of ephemeral recording. Or you want it to be sole both as to the purpose of facilitating a transmission to the public. And that transmission is solely for BES performance. Which, by the way, is solely, not sole. I think that because of the construction of the sentence, I just don't think you need that second solely. Can I call you probably against your will back to... Jurisdictions?  So to start, you made a point that somehow there is a determination even when there's a settlement in royalty proceedings. I don't see that in 803. They just have to, you know, if it's royalty, notify people, have your period of voluntary negotiation. And the same for distribution. And they only do any... The board only does anything more under four and five. Um, where is this, um, requirement that if it's a voluntarily negotiated settlement involving royalty proceedings, then there will still be a determination by the board. Is that in the statute? I don't have the site off the top of my head, Your Honor. I do know... I don't see a distinction in your briefs at all. Well, I think the reason for that is if you were to look at the actual... In each of these proceedings, if you were to look on the docket of these proceedings that were reopened, after the settlements, there was a final determination issued by the Corporate Royalty Board. This is not something I think that Stanischinger, the board, would dispute. If you look, there was in the federal register, there's a final determination and the judges recite. First, they publish. There's a process for these... Are you saying that you're not aware of a statutory provision that says, even after a voluntary settlement... No, I believe there is. ...proceeding. Okay. I believe there is. If you can give me that on a bubble then. Okay. But I would also point out that it couldn't possibly be disputed in both of these proceedings and in all of the proceedings that have ever been settled. What the judges do is... Royalty and... Oh, I don't... Not distribution. I'm just talking about... Excellent distinction. But for rate-making proceedings, the process is, and I'm sure it's required by statute, is that they... First, the judges publish the settlement terms, and there's a period where people can... Interested parties can comment, okay? And then after the review for reasonableness that I discussed, they then issue a final determination where they adopt the terms and implement those into the federal rate. And in both of the proceedings that were reopened, there were... Right, they said adopting and put it into the federal register. Right, in a final... But what they issue and what they publish... Do they decide anything? Well, they decide that the terms are reasonable, yeah. And they have authority to change them? Yes. And then the other thing that I'm a little confused about is what was reopened in here were two settlements. Was everyone who was a party to that settlement, those two settlements, everyone notified of this proceeding? Yes, Your Honor. And technically, what was reopened were not settlements. What was reopened were the prior proceedings before the Comparative Royalty Board, okay? I understand. But they're changing. If they're going to change, as we can see, had someone said, when you all agreed into this agreement here, did you know, copyright holders, that you were giving up this? Okay. As you read it, definition of gross proceedings, they might... I would have thought there would have been a lot of very unhappy copyright holders in the proceeding. Well, first of all, let me answer your question directly. Yes, both when SoundExchange filed its motions to reopen the proceedings and every other filing that either party made during that process, they were all served on all of the participants to the original rate proceedings. So that notice did go out. They all did have notice of it. Now, with respect to copyright owners, their interests are represented by SoundExchange, so... Every single copyright owner. I don't want to speak to SoundExchange. But... They were the only ones who participated in the prior proceedings on behalf of the copyright owners. So they would be the only ones who would have standing to participate. When they have the notice and comment period, do you typically not get comments from individual copyright holders? They just trust SoundExchange to handle that? For settlements? You're talking about when a settlement... For the whole process, I guess. There are a lot of different types of processes here, and some require notice and comment. And during the notice and comment period, I'm just wondering if you typically do get input from individual copyright owners, or do they just trust SoundExchange to represent them? My... Well, with respect to final determinations, I don't believe there is a notice and comment period. If you are a participant, you can object or you can appeal. Once it's final, the final determination is made, then participants who are aggrieved can appeal to this court. But there's no general notice to the public for comments. For a usual determination, I was under the impression, maybe I misread something, that I thought when you're just doing a determination, not an amendment, just a determination, is there like a notice and comment period? I don't... I think that the law is that you have to be... People can... I believe when there's a settlement, a proposed settlement that the judge is going to adopt, at that point, there's a publication and there's an opportunity for comment. But the Corporate Royalty Board has held, I believe, that unless you were a participant, the objections really don't count for a whole lot. But with the final determination, it's not... It's for petitions to participate, I guess. Correct. You have to be in and you have to be in for the whole thing in order to maintain the ability to appeal or have some sorts of objections. So I'm just trying to figure out what might have been missing from the process here if it were inadequate. Because if they're trying to amend a determination and we think an amendment has to deal to technical things, and this went beyond that, what normally would have had to have happened? Like if it's not technical and it's... So it's not an amendment, it's a determination. What would have had to have happened here to make a new determination as opposed to reopening an old determination? Yeah. I believe as long as all of the people who had filed notices and had actually participated all the way through had notice, that's it. There's no general public right to participate in these proceedings if you don't file a notice. So if Judge Walton had certified this over to the Corporate Royalty Board and instead of you petitioning to reopen, you just said, we would like a determination on this issue, what would have happened? They have no jurisdiction to do that. They can only institute a proceeding on the rulemaking side. There are several different statutory licenses. Each one comes up for renewal every five years. And that's the only way they come up for an initial determination? There's one other way I think about it. If there's a new type of service that falls within a statutory category, then SoundExchange or the service can then ask the board to institute a new proceeding. But it's only that would be to set different rates and terms for a statutory license that there's never been a service like that. I see. I see. So the only game in town is an amendment to a prior determination based on the facts we have here. It's the only way you can sort of sui sponte do something that's not on the five-year license clock. That is correct, Your Honor. The board does not have jurisdiction to just institute proceedings because it wants to, or even because parties ask them to. It has to be linked to the statute and particularly these licenses.  So C-4 is a basis for them acting, for acting under C? Correct. How much money is at stake in your differing interpretations of that regulation? In the actual royalty, I'm sure it's tens of millions of dollars. Wow. Is that a technical or clerical correction? Well, I think it's technical and the argument from the register is... No, I know. I understand the register's argument here. Technical or clerical is a term that's used in statutes elsewhere, and it means... Oops, misspelled word. ...doesn't mean a decision, a hotly contested decision between copyright holders and users of their music that will determine where tens of millions of dollars go or don't go. And what possible dictionary definition can you give me that that would fall within that? Well, Your Honor, I would say first... It seems like it's unsettling, a settlement agreement. I don't think whether the error is clerical or technical. Not clerical. Well... What's technical about it? Well, I think that the argument would have to be that there's an ambiguity that by implementing a regulation that was ambiguous, that amounted to either a clerical or a technical error. Right. We would have to hold that this substantial dispute on the meaning of determining what royalty is going to be paid, right? This is tens of millions of dollars in royalties that you would or would not have to pay, correct? Yes, I would say, yeah. And if they normally, I mean, they can do technical errors, clerical errors, or modified terms, but not the rates of royalties. Correct. Payments. Isn't this directly resolving an issue about the rate of royalty payments? But it's not modifying. It's saying what the regulation was supposed to mean. And that's... Is technical or clerical? It's not clerical. I don't see how that's technical in the way that that is used in other statutes or court rules. Do you have any definition where something that is a substantive dispute about royalties that are owed or not under this statute would qualify as technical? Whether the board introduced an ambiguity into the regulations or allowed... They didn't introduce an ambiguity. The parties here chose to carry this regulation, with all its baggage or not, into a settlement agreement. And we're going to... I'm just asking you for any natural meaning of, and it's clerical or technical, those errors. That's a category. And that's a category that's different than modifying the terms. Your Honor, it could only be... And the reason that my husband's... I'm not trying to be difficult. In candor to the court, Music Choice made the argument to the district court that there was no jurisdiction for the Copyright Royalty Board to issue these types of regulations. Yeah, this doesn't fall within C-4 at all, right? I'm agreeing with you. I understand, but we lost that, and now we're five years later. But you lost it before them, not before us. Understood, Your Honor. Understood, Your Honor. Can you clarify one thing? You never argued that 803 C-4's technical or clerical authority does not encompass the ability to clarify regulations, right? You made other objections to 803 C-4. We argued that before Judge Walton. We did not argue that before the Copyright Royalty Board because there was the register's ruling, which was binding on the Copyright Royalty Board, that came out the other way. Judge Walton, did you argue that register is wrong and they have no authority to clarify any regulation under 803 C-4? My recollection is we didn't specifically say the register was wrong. We just went straight to C-4 and said this is not a technical correction. We made other arguments as to why it wasn't appropriate for a referral, but we did argue that. That it's not a technical correction because technical correction in the statute means what, in your view? Right. What it means what, in your view? Well, in that technical correction or clerical, we didn't really say what it would mean, but we said that just resolving an ambiguity where parties have differing views of what the regulation means was not a technical correction. Admittedly, we didn't spend a lot of time on it in the brief, but we certainly made the argument. So it seems to me then the upshot is the Copyright Royalty Board attempted to, well, purported to reopen a determination to resolve a question, but under the provision for reopening C-4, it was only allowed to do technical, make technical corrections, and so it exceeded its authority to do that. And so if that's what we think, then we have jurisdiction because they purported to amend. That's what's before us. But we vacated because it wasn't technical. And I don't even think a remand is appropriate, is it? Just if we think there's no way you can do this under C-4 and C-4 is the only game in town, then it seems like there's not even a point to remand. We just vacate. And then you go back to Judge Walton and say, you resolve this. Is that what happens? Your Honors, I agree with you. I agree with you. If Your Honors find that the CRB didn't have jurisdiction under the first part of C-4, then you would have to vacate. Under any part of C-4, honestly. Well, yes, because I think the second part is a non-starter, like an amending because of unforeseen future occurrences that frustrate. If you look at the legislative history of that provision, the example they gave was if sound exchange, if the collective that had been designated to collect royalties went out of business in the middle of a rate period, could the Copper Royalty Board, you know, change the collective? Like, actually, that would be a substantive amendment changing what the regulation is, right? And they need to be able to do that in exception. Why did you argue this in your brief? If you disagree that it doesn't go to our jurisdiction, it actually sounds like a straightforward ground on which you would argue this exceeded the Board's authority under 803-C-4. And the normal response we would give was, well, you didn't exhaust that before the agency, and you forfeited it on appeal. So why is that not the way to think about it? Well, Your Honor, for a number of reasons. Number one, there is the register's ruling, and I do think that Music Choice just didn't take a position because, frankly, to be, again, candid, we're now five years down the road. Music Choice is a tiny company in Horsham, Pennsylvania. We didn't want any of this to happen to begin with, but now that we've gone through it, we wanted to get a resolution, so we didn't, you know, and there is an register decision. I would understand if the court disagrees with it, but it's not like it wasn't based on anything. It was an interpretation of what the register thought. Now, whether under Skidmore the court finds that persuasive or not, it's certainly the register of copyrights talking about a technical provision of the Copyright Act. So I appreciate that. I just have one last question about the practical. We have all jurisdictional questions, and I'm not sure how this connects technically, but in a practical way, we're just reviewing an interlocutory order. There's an ongoing district court proceeding, and it's very odd that we're here, and I think the practical way of asking the question is, you know, you chose to appeal now. You also could have just gone back to the district court. I suppose there would have been a judgment entered against you, and you would have appealed to us then. What is lost if you have to do the latter thing? Well, a couple of things. That process would take—it's not just that we go back there and the case is over, right? The case never got started. So at that point, assuming, and Judge Walton indicated he felt like our deference should be paid to this—we disagree with that for a number of reasons—but he already indicated he was inclined to go with whatever the board said. But then we would be—there are other disputes in the case and damages and everything else. So you're talking about another— Those are there either. You've got to deal with those regardless. Well, not if we prevailed on this appeal. I mean, there would be likely to— So if you're listening to the first argument, you're asking for a ruling to guide further proceedings on remand in the district court. It's just a little bit odd. Yeah. I mean, I think the bottom line is that this decision, if it stands as a determination, an amended determination of the Corporate Royalty Board, also has independent legal significance other than in connection with our district court litigation, okay? Because in the next CES proceeding, which is going to start in two years, this court has held that to the extent a court wants to change regulations, they have to support that. There has to be more of a showing than if they're writing on a blank slate. Like, what is motivating the change, especially if the parties have relied on that for a number of years, right? So having this final determination about the meaning of this regulation will change— Well, it's going to change either way, right? Someone's going to be unhappy, right? You're going to—someone's—you're going to have a new interpretation. And quite frankly, the district court could have just asked for it. Maybe, I guess, we'll hear what the government says in Amicus brief from, I don't know whether it's the Register or the Library of Congress or the Royalty Board, but somebody on what this means. You can read what they did, but the question is whether—if there's going to be a decision, there's going to be a decision, but now is not the time to—I should have thought you wanted to go back and make your legal arguments in the district court, but this is jurisdictionally baseless, which the government seems to— Well, I mean— Maybe, I agree. I mean, the Music Church was trying to get the issue, the key issue, resolved. And the quickest way, having taken this detour, was this. If it was an amended determination, which is the only thing it could have been, if they had jurisdiction to do what they do, it could only be a determination and it would be subject to appeal in this court. So— Okay. Questions? All right. Thank you. Thank you, Your Honor. I'll open the government now. Good morning, Your Honors. May it please the Court, Amanda Mundell on behalf of the government. I want to pick up right where the Court left off with a colloquy with my friend on the other side and this somewhat extraordinary claim that an agency simply has no authority to offer a non-binding interpretation of its own regulations. And instead, there needs to be some sort of express statutory grant of authority to do that. That is quite extraordinary. Agencies have always been understood to possess a measure of authority to issue, again, non-binding interpretive guidance, which is exactly what the copyright royalty judges did here. So we see— What is the source of that authority? I'm sorry, Your Honor? What is the source of that authority? It's inherent authority. And the district court actually recognized that in its opinion, referring the matter into the court. We've got an agency here where Congress has been very, very specific about what their role is and does not make determinations if people don't work it out themselves. That's it. They—the only authority even to make regulations are all procedural ones for conducting their determinations. So anything that they decide about how they interpret some term or something has got to be done either through a determination and a contested dispute or adopted by the parties in a settlement agreement. There's just no other rule. Your Honor, respectfully, I disagree with that. Now, if the board were taking some sort of making a determination, things to that effect, of course, we agree there would have to be some sort of statutory grant of authority unless some other independent basis gave the board that authority. But that's not what the board did here. What's your best case for this inherent authority to provide opinions? Well, Your Honor, there's—I don't think there really is a case that has grappled with this background principle. We were shocked that we hadn't recognized this inherent authority, but there's no case recognizing it. Your Honor, I think cases like our and Kaiser, of course, recognize an agency's authority to interpret its own regulations. You know, there's other cases that are— The board's regulation. This was the registrar's regulation. She's the one that put all this—she or he—put all this language in to this gross proceeds definition. I think the librarian might have introduced that language, and this is all— Okay. It's a weird procedure. Okay. There are a number—and there are a number of— The Librarian of Congress is or is not even in the executive branch. That's a whole other thing we don't want to go to today. We have to get into another context. And so does the Librarian of Congress have the inherent authority to provide— An interpretation, Your Honor? —regulation to the district court? Well, I don't think the librarian is the one providing this interpretation here. And in fact, the librarian added that language in, you know, part and parcel of the predecessor agency's regulation to the board. And so really what we have to think about is this regulation originated with the CARP, which was the predecessor agency. And now the board, which has inherited all of the CARP's authority, is issuing a ruling on regulatory interpretation. And, you know, the court asked me for a case about this inherent authority. I don't have a specific case that grapples with this principle. There are cases that get at this, though, in other contexts. I could point the court to Barr v. Mateo, which is 360 U.S. 564. And that doesn't deal with an agency. It dealt with Bill Barr's inherent authority to issue a press release on matters connected with his duties when he was an acting director. That seems a lot more obvious than what happened in this case. Well, actually— That an attorney general can issue a press release is very different from what happened in this case. I don't think it's any less obvious than here. I'm surprised that you would get up and start with there's some kind of inherent authority to do this when it seems clear that what the board thought it was doing was reopening a determination. It reopened a determination and was trying to amend a determination. So why aren't you just relying on what the board actually thought it was doing? Well, Your Honor, and I think that some of the calls we pointed this out, the board didn't actually say that it was proceeding under 803c4. It referenced the registrar's opinion that the board has authority to issue rulings on regulatory interpretation under 803c4. So it's relying on c4, like that note 6. That's true, but— Ultimately, it's relying on c4. But I think 803c4's language matters here. Disclaim inherent authority at that time and say you've got to go under c4? I'm sorry, Your Honor, could you— Did the registrar in that decision disclaim inherent authority and say instead the board can only act under 803c4? I don't think so, Your Honor. I had that decision with me. I don't see that expressed disclaimer. And, in fact, the registrar even didn't bother to grapple with other possible sources of authority, like the APA. So it was simply focused on if you're going to issue an amendment that clarifies a regulation, you can do it under 803c4. To build on these questions, right, normally when there's a question about the source of an agency's authority, we expect the agency to identify that authority. And we apply the Chenery Rule to what authority, and regardless of how you read note 3 and note 6, which think like, you know, if that's all we have, it seems to tilt towards they thought they were doing 803c4. I don't think there's anywhere that they say something like we are relying on our inherent authority to respond to—give an advisory opinion under the doctrine of primary jurisdiction, right? And, of course, it's not surprising that the judges didn't say that because neither party suggested that the judges couldn't respond to a question like that. I think that's right. So if you think about it in a Chenery way, the only authority anyone ever mentioned was 803c4. We've got some footnotes that gesture at 803c4. And the natural conclusion would be that's the only authority that the board thought it was invoking. And again, Your Honor, I think that even if the board thought that 803c4 allowed it to reopen proceedings, the question is, what did it do once it reopened those proceedings? All it did was issue an advisory opinion. It didn't make any amendments. If it had this inherent authority, why wouldn't it just said so instead of gesturing at c4? Since it's as obvious as you think it is, why didn't the board think so? Your Honor, I don't know if the board thought it was, you know, obvious or not. Because they wouldn't have had to gesture at c4 if they had obviously this inherent authority to do what you said that they could do. Respectfully, Your Honor, I think this is the sort of conduct that when a district court asks an agency for an answer, you know, what is the agency supposed to do? The agency gives the court an answer. And it's not the kind of thing that... That's not really the issue. The issue is it gave an answer, but it proceeded under c4. And again, Your Honor, I think... It didn't say I have an inherent authority to answer the district court and here's my advisory opinion. It's that it went to the trouble of reopening two-pride determinations and presumably or purportedly amending them. And I have a couple of responses to that, Your Honor. I just want to pick up on the reopening aspect because it's come up a couple of times. It's simply a ministerial matter. There had to be some place on the docket to answer this question. That's why the board... They didn't need to go to the docket at all, according to you. My understanding is that in order to issue that ruling in some way, it has to do it on a docket. That's my understanding. Why would they have to do that if they have inherent authority to issue advisory opinions? Your Honor, I think there might have been a manner where the board could have answered this question in a different way. Perhaps the parties could have asked for the board or the librarian to offer a statement of interest in district court. But the way that this all came about was that sound exchange moved to reopen the proceedings. There was an opposition to reopen, one versus three. And at the end of the day, the board determined that it would reopen the proceedings solely for the limited purpose of answering the district court's question, not to amend any regulation or modify the text of a regulation, which was... This doesn't fall under... What they did does not qualify under C-4. I don't think so, Your Honor. They're not allowed to do this under C-4. Well, 803-C-4 just isn't relevant to what happened. It didn't amend, it didn't modify, it didn't correct an error. I would say that 803-C-4 is just not... It's ill-suited and it's not relevant to what they did. I would like to know whether the government thinks that what they did here does fall under C-4 or any part of C. No, I don't think so, Your Honor, because there's no amendment and no modification, nothing changed. You're just availing the register's memorandum opinion that says that they can do this as a technical clarification. So you agree that that is not permissible? No, Your Honor, and I want to be specific about what the question here is. There may be circumstances where the board uses 803-C-4 to issue a technical amendment. There may be times when in issuing that technical amendment, the board is construing a regulation to do so. It just so happens that here, the board's answer to the district court question has nothing to do with an amendment. It doesn't change the text of the regulation. It doesn't add a word or take anything away. The board thought it was amending its regulation. It's gesturing at C-4, and it's got authority that says it can do this. This register's memorandum opinion that says that it is a technical amendment to clarify an ambiguity. You're coming in and sort of saying, no, no, that's not what they were trying to do. But the record shows that they thought that they were reopening and amending, which they thought they had authority to do based on this memorandum opinion, which is cited in JA-115 Note 6. And so I'm asking you, if that's what they thought they were doing, are you agreeing that they could not do that and that this register's memorandum opinion is incorrect, false, cannot be relied upon? MARY JO GIOVACCHINI We haven't taken a position on whether the register's opinion is false or unreliable. There may be certain... IVETTE ESTRADA I think you just have by answering Judge Millett's question and saying that C-4 doesn't allow them to do that, because that's exactly what that memorandum... MARY JO GIOVACCHINI You're right. I'm talking about this case specifically. There may be other cases where that register's opinion actually makes a lot of sense for what the board is trying to do. And here, even though the board gestures to 803 C-4, I think this court still has to take a hard look on what the board actually issued. And here, the board didn't issue an amendment. It didn't issue a modification. IVETTE ESTRADA That's not what the register's ruling says you can do. It says you can clarify, give your position on what an existing regulation means. Of course, it didn't give an amendment. It issued what it calls a ruling on regulatory interpretation. It published it in the Federal Register. Isn't that exactly what the guidance, what the register's ruling envisions you would do in this situation? MARY JO GIOVACCHINI Your Honor, I think the register's ruling envisioned some sort of technical or clerical correction. I would have to go back to that particular instance, because it entailed a provision about whether an exclusion included or didn't include certain things, and the regulatory text has since changed. So it's very possible that in response to that register's opinion, all of that work then resulted in some sort of change to the regulation. That, of course, is different here. I'm not steeped in that instance, so I don't want to express a clear view on that. But I think even— IVETTE ESTRADA It sounds like—so, I mean, this is why the Department of Justice represents agencies to express the views of the United States. And so, looked at what happened here, and have concluded that it is not, at least in this case, as it's occurred—as it's written in this context, and what they decided, there is no authority under—statutory authority under Subsection C to have made the decision they made here. And so you are offering another legal source of authority for their actions. Is that how I should understand what you're saying in this case? MARY JO GIOVACCHINI I think—I think—correct, Your Honor. I just want to make sure I'm clear. 803 C-4—the agency didn't need to invoke 803 C-4 to accomplish what it did here, which is just issue a non-binary response. IVETTE ESTRADA A very different response, mine is that—I thought you had answered me directly. What they did here does not fall—does not qualify under C-4. MARY JO GIOVACCHINI Yes, I think that's correct. IVETTE ESTRADA And then, when you talk about the inherent authority, I think what's—this is another thing that's just very unusual, but aside that they didn't invoke it, there may be a good reason Congress really challenged what they're doing, because usually when an agency—they promulgate—they have a power to promulgate substantive regulations, freestanding, just to administer the program. Here, they only have authority to promulgate procedural regulations. And then, as it turns out, they make decisions that then label—determinate regulations. And the course of—they could do that in the course of a determination, a contested determination. Or parties would say—I mean, like, I guess it's originated in the first place, but you're saying originated and they disputed such a case in 2002, if I have that right. Anyhow, you've got a regulation, you go, well, we're going to put that into our settlement agreement. Are you aware of any case where an agency has the inherent authority to interpret a substantive dispute in a settlement agreement? Because, you know, the consequence of that is it's very unsettling to a settlement agreement, one side or the other. And isn't that what's—where this becomes very complicated? I'm not aware of a case off the top of my head, Your Honor, or something analogous, but I actually don't think that the settlement overlay is relevant to this dispute because the regulation arose not because of negotiated language between parties, but because the predecessor agency, the CARP, needed to craft a regulation, and the librarian added some language to it. So it's not as if— Yes, but that—they only reopened two of the three proceedings. And then it did not include the original one. This was adopted in a contested proceeding. They reopened two proceedings that were not formal determinations under the statute. They were just settlement, negotiated resolutions of royalty rates, at which point parties chose to incorporate that preexisting regulatory language. And it seems to be quite a different thing for an agency to step in, reopen an approved settlement, and say what the meaning of terms in that settlement agreement mean. People say they're just clarifying, to clarify what a term, a substantive term, this is the rate they have to pay in a settlement agreement, is. And I take the court's point that if that was what was going on here, reopening a settlement agreement, clarifying terms in a settlement agreement, that might look a little different from what we typically see agencies do. I'm not exactly sure that that's what's going on here. I agree with my friend on the other side that, you know, the board's not really reopening an agreement. It's reopening a proceeding that resulted in a determination that flowed from a settled understanding between the parties of what a percentage rate ought to be. And it's true that that, of course, referenced and incorporated the regulation. But I think the board here was interpreting a regulation, not really trying to interpret terms in a settlement agreement, even though they may have been. We have said that when the board adopts a settlement agreement, that is not a subsection C determination. They want to say it's different for distributions and royalties. We can debate that. But it's not a subsection C. So they're outside their subsection C bailiwick altogether. And that might be true. I confess I don't know if that's right. I'd have to think about that a little more and look a little more closely at the text. But I think the upshot of this, Your Honor, is that even if the court thinks that the board couldn't, you know, reopen a proceeding to clarify a term in a settlement agreement, I think that only underscores why what the board here did is just nonbinding guidance, that the district court can take from it what it wants, that this proceeding actually belongs in district court, where the district court will make a final determination as to the meaning of this regulatory language. And then, you know, the party who is, you know, unhappy with that result on final judgment can appeal to this court or even seek a 1292B and move things along a little more closely. So I think no matter how you slice it, whether the court, you know, doesn't think this is an inherent authority thing. You're bringing us up on 1292B when our jurisdiction is limited to proceedings under C. No, no. I'm talking about appellate jurisdiction from a district court determination. Okay. And I think this underscores why this court lacks jurisdiction in the first instance to review the challenge here. Do you have... I just have one other question. How does primary jurisdiction still work in a Kaiser Loeb or Brightwork world? Does the government have a view on that? We haven't taken a position on that in this case. Have you taken it anywhere? I don't know, Your Honor. I don't want to speak for other matters that our office is handling that may or may not take that position. I don't see the parties really disagreeing that the district court could refer a matter to the board for ruling on regulatory interpretation. I think the parties maybe just disagree on what the impact of that referral was in this case. So that's why we haven't taken a position on the primary jurisdiction question. Just one clarifying question. Going back to the discussion earlier, page 21 of your brief says the judges have continuing jurisdiction to correct technical errors in the board's regulations, including clarify their scope, citing this register determination, but that was not the authority they exercised here. Is that the same or different than what you're saying today? I think that's the same, Your Honor. I think we're not trying to disclaim what the register has said in that 2015 opinion and whether the judges have authority under Ada 3C4 to issue technical corrections and to, you know, clarify the scope in connection with that opinion. That's just not really what they did here. There's no change or modification to the regulatory tax. Instead, you know, I think this court could consider what the board did akin to, you know, submitting an amicus brief. There's just no final action. There's no impact on the parties. District court gets to decide how much weight to give this at the end of the day when it goes back to district court. I know we've been talking a lot about jurisdiction. I was hoping I might have a little bit of time to respond to some of the other statements that have been made earlier, although I see that my time has expired. Before you do that, I wonder if you could comment. We have a Case Johnson v. Copyright Royalty Board from 2020. And in that case, we rejected, quote, vacillating gestures to uninvoked authority. And we vacated the copyright judge's action. And we said, and this is a quote, the board has considerable freedom to determine its own procedures, but that flexibility must be exercised within the lines drawn by the authorizing statute. Congress's decision to limit rehearing to exceptional cases and to confine other post-hoc amendments to cases involving technical or clerical errors would be a nullity if the board also had plenary authority to revise its determinations whenever it thought appropriate. How does that fit in with you coming in and saying that the court has inherited authority to do what I think this case says it can't do? We disagree that the board is revising anything. I think that's the big distinction between Johnson and this. There's simply no change. And in fact, Music Choice doesn't identify a change. I think it's pretty telling that at the end of the day, Music Choice is still going to have to go before the district court, just like sound exchange, and hash out whether the board's interpretation is right or wrong. There's actually nothing that happens as a result of this interpretation. To just to do this if it's not within the context of the procedures that are permitted under C-4? Your Honor, I don't think there's... ...within the statutory lines. I think, again, and I apologize, guys, this is probably an area of disagreement between the two of us, but I think that case is talking about revisions that are made by the board. There's no revision by the board here. So there's no inconsistency between that case and what we're saying here, which is that the board doesn't need statutory authority to just answer the district court's question and share its views on what the regulation means. And I think the APA sort of acknowledges that that's permissible. If we think the board is not allowed to do that, that it actually needs to act in accordance with its statutory limits, you still think that this is not the kind of thing that we can review? Yes, Your Honor. And I would just love to provide a brief answer as to why that is the case. If this court thinks that the board had to proceed under 803c-4 and did proceed under 803c-4, I think you still have to look at what the board did. Did it really issue a determination? And, of course, this ruling on regulatory interpretation doesn't have any of the hallmarks of a determination or a determination made in a proceeding that would be described under 803c, and that's why this court wouldn't have jurisdiction anyway under D to hear this dispute on direct review. That doesn't deprive music choice of this court's jurisdiction down the line. Is that a jurisdictional question? Because it seems to me like we get cases where people say they were purporting to make a determination, but they didn't follow the procedures, or they're purporting to make a determination, but they weren't allowed to do it this way. That doesn't become jurisdictional if we agree that they weren't allowed to do it that way. That makes it not a determination, and therefore we have no appellate jurisdiction. I see the inquiry a little bit differently. I think even if the court thinks that the board, you know, was trying to exercise its authority under 803c-4 to issue a technical amendment, I think this court would still then need to ask itself, is the thing they issued actually the reviewable determination that the statute provides exclusive jurisdiction for this court to exercise? Can you think of a precedent that says that that's the way this works? Because, you know, we get lots of challenges to determinations or rulings or agency actions, and if we agree, you could always try to frame it, like, so it wasn't a determination at all. Therefore, you have no jurisdiction. Like, I just don't understand how that works. I think, unfortunately, that might just be, you know, part and parcel of the statute. The statute makes pretty clear that this court has jurisdiction to review, in the first instance, final determinations by the board. And so the court would have to... Do that in IPG. I'm sorry, your honor? Under IPG, we said that something doesn't count as a determination for purposes of our statutory pieces of a determination.  Because the jurisdiction turns on it being an H03C determination. Yes. So I think that's, you know, the court has engaged in this analysis before. Sorry, I know you weren't sure if you have any more at this point questions right now. I think we... Well, I'd love to hear your main points on the merits. So turning then to the merits, you know, I think there's a few places to start. But I think, you know, Music Choice's ultimate framing here, which is that it shouldn't have to pay twice for the same copy. That's a false framing. As I think some of the questions from this panel have, you know, gone back and forth with my friend on the other side have perhaps illustrated. You have to read this regulation in context with the statute and the other regulatory provisions as a whole. And the starting point, if I could just take a step back and sort of clarify how this all fits in, is that if you're going to run a business establishment service, you got to get a license. And the license that you get is an ephemeral license. It's the license you need to make the copies that are then used to facilitate the transmission to the business establishment. You just can't send music to a business establishment if you can't make the copies to do it in the first place under this license. So that's why the license is necessary. And the statute actually makes clear that that license has to be used in connection with that service. So if you have your cable TV subscribers, you get your ephemeral license for those. And if you have your business establishment subscribers, you get a separate ephemeral license for those. And you use that license to make and use the copies to facilitate the music transmission. The statute also directs the board to set rates for the use of these licenses and that those rates should reflect what a willing buyer or seller would be paying and negotiating in a marketplace. So when you think about how this regulation operates, the regulation that directs that business establishment services have to pay a percentage of their gross proceeds, you have to ask yourself, what would a willing buyer or seller negotiate for? And here, it's pretty hard to imagine that a seller would say, well, if you got an ephemeral license for your cable TV subscribers and you have an ephemeral license for your business, if you use the same copies for both, you don't have to pay any royalties on the stuff you're sending to the businesses. That's on the house. It's pretty unusual that a seller would actually negotiate for that. And I think that's one of the first reasons why we can see that the board's interpretation of this regulation is reasonable, and Music Choice's interpretation is quite unreasonable. Can you tie that to the statutory language, though, or the regulatory language? Of course, Your Honor. I think the starting point there is subsection A-1, which just as a general matter, when you make ephemeral copies, you have to pay a royalty equal to a percentage of the gross proceeds derived from the use of those copies. It doesn't say, you know, derived from the use of those copies solely in connection with the business establishment if you might have those copies going somewhere else. It's just as a general matter, pay a percentage equal to the gross proceeds derived from the use of the copies. What does for the sole purpose do on your reading? So under A-2, as the board explained, the sole purpose clause connects back to in kind. And I think it's useful to note that there have been a lot of other interpretations offered back and forth today. I think that will be underscored. This is the biggest problem with what the board said, is it flies in the face of everything you started out saying about how the world ought to work. It just has this bizarre rule, so long as you pay, if it's bizarre, that rule is triggered when you use in kind payments. For some reason, no one explains. I'm not sure it's so bizarre, although I agree that it's not, you know, super... Well, you just started as your strongest argument saying this would be bizarre. And yet the board said that that's what we wanted for in kind payments. And your honor, I can try to offer an explanation here. I will say at the outset, the regulatory history is very unclear as to how the sole purpose clause even popped up, because it wasn't there before the librarian added it. But I think, you know, if I understand Music Choice's position today and their example about how they have cable subscribers and how they get their money, it sounds like, you know, they contract with cable companies who have a variety of different streams to individuals. And so the money that they're getting from the cable companies might be quite easy to distinguish between the customers that fall under the business category and the customers that fall under the individual category. But if they have some sort of in kind arrangement with the cable company, you can imagine a circumstance where maybe it's not super clear how to allocate that between the business stream and the individual stream. Can you describe what an in kind relationship would look like in this context? I don't have a great example, your honor. Maybe some sort of free advertising agreement or some other exchange that doesn't include actual money or fees. I think that would be kind of a rare thing, wouldn't it? It's possible. I know that Music Choice has suggested that it hasn't accepted in kind payments. That, of course, doesn't mean. Very strange. And just the fact that, you know, even if. Do you think the best reading of this regulation is the copyright royalty board's reading, which is that all of that modifies in kind payments? I think that's certainly a reasonable reading. And that's reasonable not just as a matter of, you know, grammar and how the language itself reads, but it's reasonable in connection with A-1 and the overall statutory scheme. And I think, you know, you can look at it sort of on the other side of the line. If A-2 really means what Music Choice says it means, that undoes the whole operation. What if it means what I think it means, which is that for the sole purpose is just ephemeral licenses? I think that's possible. Although, Your Honor, I'm not sure that that would really give effect to the concern that the CARP and the librarian were trying to solve, which is. They would have to pay for every use of an ephemeral recording. To be sure. To be sure. But I think in the regulatory history, there's a suggestion that there was a concern that gross proceeds might not fully capture in kind payments. Now, of course. In kind payments are still in there in a prior clause. So in kind payments are in. True, true. This thing about for the sole purpose, it seems to me just to be describing ephemeral recordings. Your Honor, I think that's a possible reading. The only reason I'm offering any amount of resistance is because I do think that the board is correct that there's, you know, something about making sure that in kind payments, which aren't like money and easily traceable, making sure that those are solely coming from the business establishment revenue. So I can see why the board's regulation or interpretation in that sense would be reasonable and that might be a little different from how Your Honor is reading it. But I think all of that underscores that there are a few interpretations here, none of which align with the interpretation music choices offered, which is that A2 is actually some capacious exception to the general principle that whatever money you're getting from your business establishment service, you have to pay royalties on. Because I think if their own hypotheticals illustrate, if they just choose to use the same copy for the music they provide on all of their channels, you know, let's say they just have one cable provider and 10,000 business establishment service providers and they're sending the same music to all of them, they get millions of dollars from the businesses and they pay zero dollars in royalties. That can't possibly be what Congress envisioned when it created this as several licensing scheme, directed the board to set rates that reflect what a willing buyer and seller would negotiate, and then when the board crafted a regulation that said, indeed, you have to pay a percentage of the money that you get from the business establishment. So even if the court thinks that, you know, there might be other interpretations of this regulatory text that are more sensible, it certainly can't be that music choice's interpretation here, which is that it pays nothing for the value that it gets, would be correct and that the board's interpretation would be wrong on those grounds. All right, is that of your opportunity to discuss the merits? I'm just going to check my notes very quickly, Your Honor, if you don't mind. I don't think I have any other points that I wanted to bring up in response, but if the court has any other questions, I'm happy to answer them. All right. Thank you very much, counsel. I guess we'll hear from sound exchange now. Thank you, Your Honors. Matt Hellman for sound exchange as amicus. I'd like to say a few words about the merits, which I hope will clear up some of the questions the court has had this morning, and then a little bit about how we got here as well. On the merits, Judge Millett, I feel like you read my notes in preparing for this argument. Your advert point is exactly right. The music choice position is that they only pay royalties to the extent that a copy is used solely for the BEZ service, and they don't have to pay royalties if that copy is used for other purposes as well. That solely is not in there. Instead, as the board found, what the solely means is that— It's not solely. It's only a sole. There's only a sole, and the sole has the effect of saying that the question that the sole looks to is, is the consideration being given for this service, whatever somebody is paying for this service, is that only to get a BEZ service, or is it also to get something else? In general, and this is at page 125, JA 125 to JA 126, they make the point there that what matters is that the consideration is solely for the use of copies to facilitate the BEZ service. So if I pay for the BEZ service and only for the BEZ service, that's what you calculate royalties off of. That is, I think, indisputably correct, and Music Choice's position has all the problems that the panel has pointed to today. So you agree that this is not what SoundExchange argued to the board or what the board said, right? Because what the board said is they basically agree with everything Music Choice says about what for the sole purpose means, and just said that it—but it only modifies in-kind payments, not all fees and payments. So there's two halves to it, is how I like to think about it. That half where you say they disagree, most certainly they disagree. And if you look at page 125 to 126 of the JA, you'll see them saying that Music Choice is wrong and that what matters is that the consideration was offered for the sole purpose of facilitating the BEZ. That's the JA 125 to 126. Now, the next question is, what consideration? And the board found that only in-kind consideration tracked to that part of the statute, not all fees and payments, dollars, I guess, that track to that. Let me say what that works out to be in practice. That means that the fees and payments that aren't subject to the sole train, if you will. Sorry, I grew up in an age when sole train meant something else. That aren't subject to that provision, those are just captured by A1, the prior provision in that regulation, which says that gross proceeds count if they are derived from the BEZ service. So you're still going to have to—it's still tied to the BEZ service, but just not quite as tightly as the sole language does for in-kind payments. And as my friend from the government said, as odd as it might be to think about in-kind payments when we haven't seen very many of them, the historical record discussed in our brief and in the government's brief shows that the CARP at that time, and really the registrar and the librarian reviewing the CARP's decision, heard from industry people that in-kind payments might be made in this area. And the registrar says, you know what, it's hard for us to tell exactly what those in-kind payments look like. And you get this sole restriction that, as the board founds, ties to that, I think for that reason. But really the key point is that sole isn't solely, to Judge Millett's point. It doesn't matter if a copy is being used for 10 different things, it doesn't matter if it's being used to play music in the Music Choices CEO study, it doesn't matter. As long as it's being used to facilitate a BEZ transmission and somebody is paying for the benefit of that, that consideration is subject to the royalty requirement. And that's really, that's that consideration part. Part of their argument is, if you have an ephemeral copy and at the same time you're using it to facilitate the playing of a song at a BEZ and a consumer. Yes. It is not being used for the sole purpose of the BEZ. It's not being used solely for the BEZ, but that's not what the regulation says, or certainly what it needs to mean. What the regulation says... For the sole purpose and solely, just two different ways of saying the exact same thing. Well, it's really one that you need... Solely to facilitate a BEZ, for the sole purpose of facilitating a BEZ. Yes, I think to be complete, the point that Judge Millett said that really spoke to me is that you need two soles. Because the sole here, the sole here is, is there a payment that is... I'm going to use the word solely just because it's easier in English. Is it solely for obtaining a BEZ service? Music Choice's position is solely for obtaining a BEZ service for a work or a copy that is used solely to facilitate BEZ. It's that second solely that they need. And the first solely... And again, if you're wondering, all right, there's only one sole, what should it mean? Which one of those two should it mean? One of them, particularly on Music Choice's view, zeroes out the license. Judge, we'll get to the stakes of this case, but there are millions of dollars at stake and something like 92% of them go away if Music Choice's position is correct because much of their copies are so often, and in general, used not just for one purpose, but for multiple purposes. And just to clarify for me, what you think the sole purpose is doing is speaking to the sole purpose of the payments that you're receiving? Correct. And that's what the board says at 125 to 126, the carryover sentence. That's exactly what they're saying, exactly what we've argued. And then I think you just get to the question of, okay, well, which payments are we talking about? All payments or in-kind payments? As I've said, the historical record shows that there was a concern about the ambiguity of in-kind payments and what they might be and how they might work. That's why this extra sole provision, the sole provision of the second paragraph of this definition comes into play. That doesn't mean that A1 already requires a nexus between the other fees and payments, the dollars that are paid. So everything is covered. And when it comes to in-kind payments, to the extent those are ever made, there's this extra requirement that they be clear that they are solely for the purpose of obtaining the BEZ transmission and not for other things as well, which might happen in the case of in-kind payments, which, unlike subscription fees, are very clearly tailored or linked to the service. That's the board's reading. That's certainly reasonable. And what the, again, what my friends on the other side do, turn a license that Congress created and that's been in place for a long time into an effective nobility for sound exchange. Thank you very much. Thank you. Thank you, Mr. Buckler. I think you asked for two minutes for a rebuttal. I'll round you up to three because it's been a long time. Thank you. Let me just first respond to one of the most recent things that was just argued by sound exchange. Now their argument is that the solely relates to the consideration that's paid, right? That makes no sense. Consideration can't be paid to facilitate a transmission to a business establishment service. It's just as a matter of, it's just a nonsensical. And I thought the government claimed that that wasn't really the board's reasoning. So I just wanted to highlight that. But going back to some of the jurisdictional arguments that were addressed by the board, the register's opinion came out of a prior dispute between SiriusXM and sound exchange, right? It was the exact same situation. The government is trying to argue, I don't know, maybe it was different. Well, the point is, the important part about it, in that proceeding, the board knew exactly what it was doing, okay? After the register issued that decision linking the jurisdiction to 803C4, when the board issued its final ruling, it titled it Determination for Estoras, published it in the federal register, okay? There was no confusion and cited 803C4 specifically as the ground. There was no talk of insurance authority. And I would also note that Judge Walton cited in his order that's in the record, he cited the authority in the DC Circuit and the Supreme Court that to invoke primary jurisdiction, the court has to find that the agency has jurisdiction specifically to do that. That's why Judge Walton cited C4 and went through the analysis that he believed granted that authority. Also, I would just note that, you know, this decision was published in the federal register, right? This was not an amicus brief, the equivalent of an amicus brief. This is—it can only be published in the federal register if it's meant to have general application in the world. So trying to rewrite history after the fact about what the judges did, I don't think the court should— Fundamentally, it doesn't bind anyone, right? We now know the board's view on the meaning of its regulation, but to, you know, have a lawsuit resolved or a proceeding resolved, there will be an opportunity to say that's not entitled to the hour deference. And— Um, I do think it binds—it has the separate independent legal—it's binding on all BES services now in future proceedings as their interpretation of that regulation, which is likely the next— To govern these two settlements that were reopened? Well, it's the settlements— Interpretation for those two settlements. It's the interpretation of the regs that are in the CFR. That are also in the settlements. They're adopted in the settlements. They're also in the settlements. They were originally in the corp and then the librarians' ruling. Then they were carried forward by settlements. But at all times, they have legal authority because they're in the CFR. So— That's my point, is that it's consequential in that this is what they have said these settlements mean. Gross proceeds means in these two settlements that we reopened. Well, I think that when they issue the new set of regulations, pursuant—whether it's pursuant to a settlement or a full determination, they're adopting them as their own. It's still the Copyright Royalty Board's regulations. I'm asking a different question. I'm sorry. That is, the way this occurred is they reopened two settlement proceedings, right? No, I disagree. I don't think there's such a thing as a settlement proceeding under the— Right, they reopened two proceedings that arose from voluntary settlements rather than contested determinations. No, the proceedings arose because there was no settlement at the beginning of the period. The settlements concluded the proceedings. Okay, I think we're— But I can also cite—I can give you the cites that Your Honor asked for about this very point about how the Copyright Royalty Board—I think if you look at Section 801B7A, it talks about how as part of their roles in these rate-making proceedings, the courts can adopt as a basis for the statutory terms the settlement provisions. And it also talks about how they have to give notice and publication of the potential settlement, but then discusses them being adopted as the determination set by the agreement, but it's still a determination. But that is—sorry, I'm trying to get to the right page here. That's both—that says to adopt as a basis for statutory terms and rates or as a basis for the distribution of statutory royalty payments. So that's both for the rates and the distribution. Correct. You said this is a special thing that they do just for royalty rates. That's different from the distribution proceedings. Yes, I'm sorry, Your Honor. There are two things that are different. What they do, if you look at little one and little two, once they have a settlement in the two types of proceedings, they have to do different things. Okay? That's one distinction. There's another distinction that has nothing— Provide notice to people so that if somebody—because people are going to be bound by this, right? Yes. And then if someone objects, then they can decline to adopt it. But these were not declined to be adopted. These were adopted. I don't recall if anybody objected, but ultimately they were adopted.  Right. So they—and you don't know if anyone even triggered that proceeding. So they gave notice. Either no one objected or they chose to go ahead and adopt it anyhow, but you don't know that it was the latter. So they gave notice to everybody. And that's—there's this very important purpose of this, to make sure everybody who's going to be bound has notice. I agree, Your Honor. But it's still not a formal determination. Well, but it says here that it'll be the basis for their determination. And they say that in little one, the people that would be bound by the terms, rates, or other determinations set by agreement. So the idea is that— I'm just talking about our decision in IPGs, what kind of determination is necessary for our jurisdiction. Okay. Well, with respect to IPG, okay, that is a—it's a completely separate thing, because the holding in that case came about because there was no proceeding. That's a different distinction between rate-making cases and distribution cases. Okay. In IPG, there was no dispute between the claimants at the relevant time as to how the royalty should be carved up. And therefore, there was no notice of commensurate proceeding at all. Instead, the Corporate Royalty Board sent notice to the Register of Copyrights saying there's no dispute to distribute the funds pursuant to the claims that were already filed. Right? That's not what we have here. Here, there was a notice of—in each of these proceedings, there was a notice of commencement. Various participants filed notice of intent to participate. There was, you know, a preliminary schedule set. And ultimately, it settled. But it settled during a proceeding. In IPG-1—and keep in mind, there's also IPG-2 and IPG-3, right? Because for other categories, there were proceedings that went forward. And therefore, this court did have jurisdiction to hear. And I would also point out—it's important—in addition to the determinations, any of the ancillary rulings that are part of a proceeding get wrapped up in that determination. So I would also point out, you know, the government was making— when they were discussing the appellate jurisdiction provision, they kept saying only final determinations were appealable to this court. That's not what it says. It says any determination under C. I just don't know why you're arguing for jurisdiction. I don't know why you think I would say this thing was a problem before, and, you know, go back to the district court and consider it an amicus. Well, I'm just trying to respond to what I think was an incorrect argument. That's all I have.  Thank you. Thank you to all, counsel. We really appreciate your time and help. And the case is now submitted.
judges: Millett; Pan; Garcia